Ernest S. BEAUCHAMP, Appellant,

v.

EMPLOYERS LIABILITY ASSURANCE
CORPORATION, a foreign corporation,
and State of Alaska, Appellees.

No. 1161.

Supreme Court of Alaska.

Dec. 14, 1970.

B. G. Johnson, Anchorage, for appellant.

Charles Hagans, of Hagans & Opland, Anchorage, Dorothy Awes Haaland, Asst. Atty. Gen., G. Kent Edwards, Atty. Gen., Juneau, for appellees.

Before BONEY, C. J., DIMOND, RABINOWITZ, and CONNOR, JJ., and BUTCHER, Superior Court Judge.

## OPINION

BONEY, Chief Justice.

The appellant, Ernest S. Beauchamp, seeks a reversal of a judgment of the superior court setting aside a compensation order of the Workmen's Compensation Board. There is no real disagreement as to the facts of this case. Rather, the dispute here is over what conclusions may properly be drawn from the facts. Appellant was employed by the State of Alaska as a state trooper at all times relevant to this appeal. On April 15, 1967, while Beauchamp was on duty at Kotzebue, he was forced to make an arrest, and became involved in an altercation that lasted for about 30 minutes. Beauchamp developed pains in his back and neck following the altercation.

No attempt to seek professional treatment was made. Appellant treated himself with warm water soaks, exercises, and rubdowns, and his pain subsided within about a week to ten days. Beauchamp was subsequently transferred to Anchorage where he experienced no more pain until December of 1967. At that time, he developed pain and discomfort in his left arm and neck. Again, on February 15, 1968, Beauchamp experienced pain in his arm, accompanied by numbness in his fingertips while

driving on patrol. From this point, the pain continued intermittently and grew more severe. During this period appellant consulted two doctors who ultimately referred him to Dr. Mead, a neurosurgeon and specialist in back care. Beauchamp was hospitalized on August 15, 1968. An operation was performed by Dr. Mead on August 21, 1968.

The pains, numbness and subsequent operation led Beauchamp to file a claim with the Workmen's Compensation Board. Two hearings were held. Beauchamp testified on January 6, 1969, and Dr. Mead testified at a second hearing on January 9, 1969. No other testimony was presented. In a decision dated February 20, 1969, the Board found in favor of Beauchamp, and awarded $400 as compensation for temporary total disability and $1,700 for permanent partial disability.

Employers Liability Assurance Corporation, the appellees here, appealed the decision of the Board to the superior court. In a brief Judgment on Appeal dated May 8, 1969, the superior court reversed.[1] From the judgment of the superior court, Beauchamp has taken this appeal.

Beauchamp asserts the superior court erred in finding there is no substantial evidence in the record to support the Board's findings and award. Our review is limited to a determination of whether the Board's findings are supported by substantial evidence in light of the record as a whole, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[2]

In this case the record consists of the testimony of Beauchamp, the testimony of Dr. Mead, and two medical reports of Dr. Mead. Beauchamp testified at the earlier of the two hearings; he indicated the pain he suffered following the April 1967 altercation was not general but localized in the neck and back area.[3] Beauchamp also testified that the pain he began experiencing in December 1967 was precipitated by a change from a Ford to Plymouth patrol car.[4]

1. The relevant text of the opinion is as follows:

A review of the Alaska Workmen's Compensation Board record on this matter discloses that the Board's decision is not based upon evidence showing a causal connection between the condition suffered by the applicant and his employment as a State Trooper. The Doctor categorically indicated in his testimony that he did not know why the condition flared up; that it may have been inflammatory, not necessarily that of injury or use; and to say that he correlates the condition to an altercation occurring during the applicant's employment, as against his playing football many years earlier, he would have to base his answer on speculation. The Doctor further stated unequivocally that the applicant's condition was not aggravated by the April 1967 episode.

I therefore find, there is not sufficient evidence to support the Board's findings and award, and * * *.

2. See Cook v. Alaska Workmen's Comp. Bd., Op.No.644, 476 P.2d 29 (Alaska 1970); Brown v. Northwest Airlines, Inc., 444 P.2d 529, 531 (Alaska 1968); State, Dept. of Highways v. Johns, 422 P.2d 855, 860 (Alaska 1967); Aleutian Homes v. Fischer, 418 P.2d 769, 776 (Alaska 1966); Alaska Redi-Mix, Inc. v. Alaska Workmen's Comp. Bd., 417 P.2d 595, 597–598 (Alaska 1966); Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 542 (Alaska 1966); Thornton v. Alaska Workmen's Comp. Bd., 411 P.2d 209, 210 (Alaska 1966); Fishback & Moore of Alaska, Inc. v. Lynn, 407 P.2d 174, 178 (Alaska 1965); Beylund v. Matanuska Valley Farmers Co-Op Assn., 391 P.2d 176, 178 (Alaska 1964); Forth v. Northern Stevedoring & Handling Corp., 385 P.2d 944, 948 (Alaska 1963); Keiner v. City of Anchorage, 378 P.2d 406, 411 (Alaska 1963).

3. In Beauchamp's testimony concerning the April 15, 1967 arrest, he stated:

It was at Kotzebue, Alaska. It lasted about thirty minutes. Finally the other trooper came along and assisted me in making the arrest, and the man went to jail. I was sore for about a week or ten days, *between my shoulder blades and neck area.* (Emphasis supplied.)

4. The relevant part of Beauchamp's testimony was as follows:

I didn't have any problem until I was transferred into Anchorage three or

In his testimony at the second of the two hearings, Dr. Mead indicated that the question of causation was uncertain from a medical viewpoint, and he was not inclined to express an unqualified opinion concerning causation.[5] Dr. Mead did indicate that Beauchamp suffered from hypertrophic spondylosis, a condition of the spine which probably had its inception a considerable length of time before the occurrence of the present disability. Dr. Mead was cautious when expressing his opinion as to the causal connection between Béauchamp's employment and disability; however, it is apparent that the doctor was unaware of Beauchamp's testimony at the earlier hearing.[6]

Appellees contend that in the absence of clear medical evidence showing causation, there is no substantial evidence in the record to support the Board's findings and award. We cannot accede to such a contention.

It is obvious from the Board's findings of fact that consideration and weight was given to the medical evidence.[7] It is also

four months later, and I started working the road. Where I really notice [sic] the problem was, *when I was driving a Ford patrol car there was no problem, when I changed to a Plymouth, well, I started getting a pain* down the arm, and two fingers and the thumb would start tingling and about March I was driving a Plymouth almost all of the time, and it got so bad I went to one doctor, and he gave me traction. * * * (Emphasis supplied).

5. *See* the portion of Dr. Mead's testimony cited *infra* n. 6.

6. We think the following extracts from Dr. Mead's testimony are important in that they illustrate both an uncertainty as to causation and an unawareness of Beauchamp's previous testimony:

Q. For the benefit of the Board, will you just state briefly what his condition is and how it comes to exist?

A. In some men who are older than Mr. Beauchamp, it probably exists due to so-called usage, wear and tear or maybe some hereditary factors. Some families seem to have people that have more spur formation in their spine than others, but it does not necessarily follow the laws of heredity. Then another group of people are those who have had wear and tear by occupation and sports or childhood injuries, and perhaps this is what we would say of Mr. Beauchamp's since he had played football during his high school years, and this condition seems to have a slightly higher incidence in football players, but he had been free of symptoms. The x-ray changes would be all that would occur maybe from the active contact sport.

Q. Doctor, why does this condition begin to give trouble as it did in this case?

A. It is not always apparent. We do have a history in this case of having one bout of pain after an altercation when he was retrieving a prisoner up in Kotzebue. * * * [H]e was sore all over and had used a hot shower and so forth and it seemed to help his pain subside. *He didn't recall specifically neck or shoulder pains but he was just sore all over* at the time, and this may have had some conceivable irritative effects, but as I gathered, he did get over that. (Emphasis supplied.)

* * * * *

Q. So the incident of wrestling with, or having an altercation with a person he was attempting to arrest, in your terms would be just aggravation of condition?

A. Well, we don't really know, not having him medically examined more or less at the time, and *his memory* of all that was bothering him *was limited to his aches more all over.* (Emphasis supplied.)

* * * * *

Q. Only in this case you are not able to trace any particular cause?

A. *I don't believe he himself recalled anything that, he might have to correct me,* but during December, 1967, when the trouble all began. [sic] Of course, you see, I saw him in August so little incidents that might have preceded the onset in December of 1967, could have been more or less forgotten by him by the time I got to see him. (Emphasis supplied.)

7. In its findings the Board referred specifically to the medical evidence:

The Board finds nothing in the record to indicate the applicant suffered injury while playing football in his school days nor any complaints of neck

apparent that Dr. Mead lacked knowledge of Beauchamp's testimony which was before the Board. The Board was not bound to rely upon the testimony of any particular witness. The Board members were free to rely upon their own experience, observation and judgment in connection with all the evidence before them.[8]

Causation is not a matter lying exclusively within the field of medical science, particularly where, as in the present case, the expert witness, Dr. Mead, lacked knowledge of relevant evidence known to the Board. Beauchamp's lay testimony concerning the incidents surrounding his disability was a substantial part of the evidence in the record. His testimony was uncontradicted by the appellees. The Board was entitled to draw whatever reasonable inferences Beauchamp's unchallenged testimony, combined with other evidence in the record, would support.

In determining causation, exact medical certainty is not required. A reasonable probability will suffice.[9] This is not a case where the Board has disregarded all the evidence before it. Nor is this a case where the Board has disregarded the medical evidence. Rather, the Board simply combined uncontradicted lay testimony with medical evidence which was in itself inconclusive, to reach a conclusion. We

---

pain or tingling in his arm during the four years employment for the defendant prior to the fight on April 15, 1967. The board notes that it was also in employment when the applicant was required to drive a Plymouth on highway patrol when neck pain again came on accompanied by a tingling sensation in arm and fingers. Dr. Mead's testimony brought out many things that could have happened to cause the flare-up in December 1967, but the Board finds nothing in the record to show that such things did happen to the applicant. In Dr. Mead's October 1968 report he set [sic] that:

'The correlation of pain and discomfort does not always have to be immediately after trauma and it may wax or wane after the immediate effects of injury have subsided, such as they have done in Mr. Beauchamp's situation.'

The Board believes it is reasonable for it to conclude that the applicant suffered an aggravation of a pre-existing condition.

8. The argument that the medical testimony is less than certain is not without merit; however, medical opinion is commonly less than positive, and the Board was free to adopt reasonable inferences from all the evidence before it. *See* 2A Larson, Workmen's Compensation Law § 79.50 at 299 (1970). Professor Larson states:

In compensation law, the administrative-law-evidence problem of expert opinion and official notice finds its principal application in the handling of medical facts. The usual question is the extent to which findings of the existence, causation or consequences of various injuries or diseases can rest upon

something other than direct medical testimony—the claimant's own description of his condition, for example, or the commission's expert knowledge acquired not by formal medical education but by the practical schooling that comes with years of handling similar cases.

The Professor goes on in § 79.51 at 299–300 to state:

To appraise the true degree of indispensability which should be accorded *medical testimony, it is first necessary* to dispel the misconception that valid awards can stand only if accompanied by a definite medical diagnosis. True, in many instances it may be impossible to form a judgement on the relation of the employment to the injury, or relation of the injury to the disability, without analyzing in medical terms what the injury or disease is. But this is not invariably so.

In § 79.53 at 302–303 the reasons for the rule are stated:

In arriving at this rule, two underlying reasons may be discerned: The first is that lay testimony, including that of claimant himself, is of probative value *in establishing* such simple matters as the existence and location of pain, the sequence of events leading to the compensable condition * * * the second is that industrial commissions generally become expert in analyzing certain uncomplicated kinds of medical facts, particularly those bearing on industrial causation, disability, malingering and the like. (Footnotes omitted.)

9. *See* Maddocks v. Bennett, 456 P.2d 453, 457 (Alaska 1969).

cannot say that medical uncertainty defeats this award where uncontradicted lay testimony is available to support the Board's findings.

In addition, this court has held that in the absence of substantial evidence to the contrary, the Workmen's Compensation Act creates a presumption that a claim for compensation comes within the provisions of the statute.[10] Accordingly, it must be presumed that Beauchamp's injury was work-connected in the absence of substantial evidence to the contrary.[11] Such evidence was not presented here. Moreover if there is any doubt as to the substance of medical testimony, it must be resolved in favor of the claimant, Beauchamp.[12]

■ We find that the testimony of Beauchamp concerning the incidents surrounding his disability when coupled with the testimony of Dr. Mead supports the Board's conclusion that Beauchamp suffered an aggravation of a pre-existing condition. As this court has repeatedly held, a claimant is entitled to compensation if any of the incidents of his employment aggravated, accelerated, or combined with his disease or infirmity to produce disability.[13]

On review, the court may not weigh the evidence or choose between competing inferences reasonably possible from the evidence.[14] We are limited to a determination of whether the Board's findings were supported by substantial evidence in light of the whole record.[15] We conclude that the Board's findings are supported by substantial evidence under this test.

Accordingly the judgment of the superior court is reversed, and the matter remanded to the superior court with directions to enter an order reinstating the decision of the Workmen's Compensation Board.

10. AS 23.30.120(1) provides:
   In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that
   (1) the claim comes within the provisions of this chapter; * * *.

11. *See* Cook v. Alaska Workmen's Comp. Bd., Op. No. 644, 476 P.2d 29 (Alaska 1970); Thornton v. Alaska Workmen's Comp. Bd., 411 P.2d 209, 211 & n. 6 (Alaska 1966).

12. *See* Thornton v. Alaska Workmen's Comp. Bd., 411 P.2d 209, 211 & n. 7.

13. *See* Brown v. Northwest Airlines, Inc., 444 P.2d 529, 533 (Alaska 1968); Aleutian Homes v. Fischer, 418 P.2d 769, 777–778 (Alaska 1966); Thornton v. Alaska Workmen's Comp. Bd., 411 P.2d 209, 210 & n. 3 (Alaska 1966).

14. *See* Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 543 (Alaska 1966), where we approved Judge Holtzoff's opinion in Great American Indemnity Co. v. Britton, 186 F.Supp. 938, 940–941 (D.D.C.1960); rev'd on other grounds, 110 U.S.App.D.C. 190, 290 F.2d 381, cert. den. 368 U.S. 900, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961); he wrote:
   The only questions that the Court may consider are, first, whether the award is contrary to law; and second, whether the administrative findings of fact are supported by substantial evidence. * * * That countervailing evidence may have more probative value would not warrant the court in overruling the findings. So, too, the Court may not set aside the inferences drawn by the Administrator from the evidence that he chose to believe, if such inferences are reasonably possible and have a rational basis. * * * The Court may not substitute its own judgment for that of the Deputy Commissioner.
   (Footnote omitted)

15. *See* cases cited *supra* n. 2.